### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LIVIO BROCCOLINO,<br><br>          Plaintiff<br><br>          v.<br><br>THIRD AVENUE MANAGEMENT COMPANY LLC; MARTIN J. WHITMAN; DAVID M. BARSE; MICHAEL BUONO; WILLIAM E. CHAPMAN, II; VINCENT J. DUGAN; LUCINDA FRANKS; W. JAMES HALL; EDWARD J. KAIER; ERIC P. RAKOWSKI; MARTIN SHUBIK; CHARLES C. WALDEN; and PATRICK REINKEMEYER,<br><br>          Defendants,<br><br>THIRD AVENUE TRUST, a Delaware Business Trust,<br><br>          Nominal Defendant. | Case No. 16-2436<br><br>**DEMAND FOR JURY TRIAL** |

### <u>VERIFIED DERIVATIVE COMPLAINT</u>

1.      Plaintiff Livio Broccolino ("Broccolino"), brings this complaint upon his counsel's investigation, and where noted, upon information and belief. Broccolino is an investor in the Third Avenue Focused Credit Fund (the "Fund"), a mutual fund. The Fund is organized as a class of shares of nominal defendant Third Avenue Trust (the "Trust"), which is an open-end management investment company that includes multiple mutual funds (each of which is a separate class of shares of the Trust).

2.      On March 11, 2016, Broccolino made a books and records demand upon the Trust pursuant to Section 3189 of the Delaware Statutory Trust Act. Broccolino anticipates that the

documents and other information he obtains in response to that demand will bolster the claims asserted in this complaint. Accordingly, although the current complaint states a claim for which relief may be granted and is sufficient to defeat any motion to dismiss that the Defendants may bring, Broccolino anticipates amending this complaint in the near future to allege additional facts supporting his claims.

3.      As set forth herein, the Board of Trustees of the Fund (the "Trustees" or the "Board"), breached their fiduciary duties to the Fund by (i) failing to value the Fund's investments in illiquid securities according to "fair value"; (ii) substantially exceeding the Fund's limitation on investments in illiquid securities to no more than fifteen percent (15%) of its net assets; and (iii) failing to actively and continually monitor the liquidity of the Fund's assets.

4.      Similarly, the Fund's investment advisor, Third Avenue Management Company ("TAM"), breached its agreement with the Fund by causing the Fund to violate requirements of the Investment Company Act of 1940; the provisions of the Trust Instrument through which the Trust was created; and the investment objectives, policies, and restrictions applicable to the Fund as set forth in the Fund's prospectus.

5.      The Defendants' breaches of fiduciary duties and TAM's breach of contract became clear on December 9, 2015, when TAM shocked the investment community by notifying investors that the Board of Trustees of the Trust had adopted a plan to liquidate the Fund, and that the Fund would no longer accept redemptions or subscriptions. TAM stated: "Investor requests for redemption… in addition to the general reduction of liquidity in the fixed income markets, have made it impracticable for [the Fund] going forward to create sufficient cash to pay anticipated redemptions without resorting to sales at prices that would unfairly disadvantage the remaining shareholders."

2

6. The Fund's inability to honor redemptions, and Defendants' decision to liquidate the Fund, should not have been a surprise to Defendants. Beginning in 2014, the high-yield bond markets in which the Fund's assets traded became increasingly volatile and illiquid, and more and more investors in the Fund and other mutual funds specializing in high yield debt redeemed their shares.

7. Defendants' breaches of fiduciary and contractual duties caused hundreds of millions of dollars in damages to the Fund.

## Parties

8. Plaintiff Livio Broccolino is and has been a shareholder of the Fund since December 6, 2013. Mr. Broccolino is a resident and citizen of Annapolis, Maryland. He currently holds shares in the Fund, and he has held these shares continuously throughout the period of the alleged misconduct.

9. Nominal Defendant Third Avenue Trust is a Delaware statutory trust and is registered with the Securities and Exchange Commission ("SEC") under the Investment Company Act of 1940. The Trust has five series, one of which is the Fund. The Trust is an open-end investment company.

10. Defendant Third Avenue Management Company LLC is a Delaware limited liability company with a principal place of business in New York, New York and is registered with the SEC as an investment adviser under the Investment Advisers Act of 1940. TAM is the investment adviser of the Fund and manages the Fund's investments, subject to the oversight of the Trust's Board. According to a notice of removal filed by TAM in *Engel v. Third Avenue Mgmt. Co.*, No. 16-cv-1118-PKC (S.D.N.Y.), by virtue of its upstream members, TAM is a citizen of New York, Connecticut, New Jersey, Pennsylvania, and California.

11.     Defendant David M. Barse was a Trustee, President and Chief Executive Officer of the Trust, and Chief Executive Officer of TAM until December 14, 2014. David M. Barse is an individual and citizen of Harrison, New York.

12.     Defendant Michael Buono is Controller of the Trust and TAM. He also serves on the Trust's Valuation Committee. Michael Buono is an individual and citizen of Staten Island, New York.

13.     Defendant William E. Chapman, II is a Trustee of the Trust and serves on its Fair Value Committee. Upon information and belief, Mr. Chapman is President and Owner of Longboat Retirement Planning Solutions, which has its principal place of business in Chicago, Illinois.

14.     Defendant Vincent J. Dugan is Treasurer and Chief Financial Officer of the Trust and Chief Financial Officer and Chief Operating Officer of TAM. He also serves on the Trust's Valuation Committee. Vincent J. Duggan is an individual and citizen of Staten Island, New York.

15.     Defendant Lucinda Franks is a Trustee of the Trust and serves on its Fair Value Committee. Upon information and belief, Ms. Franks resides in New York, New York.

16.     Defendant W. James Hall is General Counsel of the Trust and General Counsel and Secretary of TAM. He also serves on the Valuation Committee. W. James Hall is an individual and citizen of West Orange, New Jersey.

17.     Defendant Edward J. Kaier is a Trustee of the Trust and serves on its Fair Value Committee. Upon information and belief, Mr. Kaier is a partner at the law firm of Teeters Harvey Marrone & Kaier LLP, which has its principal place of business in Philadelphia, Pennsylvania.

18.     Defendant Eric Rakowski is a Trustee of the Trust and serves on its Fair Value Committee. Upon information and belief, Mr. Rakowski is a professor at the University of California – Berkeley, and resides in California.

19.     Defendant Patrick Reinkemeyer is a Trustee of the Trust and serves on its Fair Value Committee. Mr. Reinkemeyer is the founder of SilverPepper Funds, which has its principal place of business in Lake Forrest, Illinois.

20.     Defendant Martin Shubik is a Trustee of the Trust and serves on its Fair Value Committee. Upon information and belief, Mr. Shubik is a professor at Yale University in New Haven, Connecticut, and currently resides in Connecticut.

21.     Defendant Charles C. Walden is a Trustee of the Trust and serves on its Fair Value Committee. Upon information and belief, Mr. Walden is the Chief Investment Officer of the Knights of Columbus, which has its principal place of business in New Haven, Connecticut.

22.     Defendants Whitman, Barse, Chapman, Franks, Kaier, Rakowski, Reinkemeyer, Shubik, and Walden are referred to collectively at the "Trustees" or the "Trustee Defendants."

## Jurisdiction and Venue

23.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because each defendant is diverse from each plaintiff, and the amount in controversy is greater than $75,000.

24.     Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391 because the defendants are subject to personal jurisdiction in this District, and a substantial portion of the conduct complained of herein occurred in this District.

## Factual Allegations

*Formation and Organization of the Fund*

25.     TAM, founded by "value investor" Whitman, manages various mutual funds and private client accounts and has billions of dollars in customer funds under management.

26.     The Fund was first offered to investors in the summer 2009 as one of five series of shares issued by the Trust. TAM managed the Fund and served as its investment advisor.

27.     The Fund engaged in "distressed investing"; it invested in high yield loans, securities issued by struggling companies and credit-related investments.

28.     At its peak, the Fund's assets grew to approximately $3 billion but then began to shrink as the fixed income markets became more volatile and investors withdrew their investments. As of October 31, 2015, the Fund had approximately $1 billion in assets.

*The Fund's Policies as Reflected in the Fund's Registration Statements, Prospectuses and Other Documents Incorporated by Reference*

29.     Mutual funds such as the Fund offer shares to investors at prices based on statutorily mandated calculations of funds' "net asset value," or "NAV" for short. Mutual funds calculate NAV on a daily basis based on determinations of the total value of all assets of the mutual fund (which may include, for example, securities and cash), minus the total liabilities the mutual fund may have.

30.     When an investor purchases shares in a mutual fund, the purchase price set for each fund share is mutual the fund's NAV. Likewise, when an investor redeems shares in a mutual fund, which in effect is a sale of shares from the investor back to the mutual fund, the mutual fund repurchases the each share at the NAV price.

31.     A mutual fund's methodology for calculating NAV, and funds' adherence to such methodology, is critical to ensure that investors receive the proper amount of fund shares when purchasing a mutual fund and are paid the proper amount when redeeming mutual fund shares.

32.     Most mutual funds typically invest primarily in actively traded securities, such as equity shares in corporations that trade on major markets or debt securities that likewise trade on active markets. For such securities, the valuation of the fund's securities is straightforward: the

valuation is equal to the market price at which market participants buy and sell the security in the market.

33.     The valuation of a mutual fund's securities for which market prices are not readily available is less transparent. Such assets include so-called "illiquid" securities, which are securities not traded sufficiently often such that a market price can be observed directly. For such securities, mutual funds are required to measure, accurately and consistently, the value of the securities in accordance with applicable regulations and the mutual fund's own public disclosures and policies.

34.     The Board formed "committees" sharing responsibility for different tasks relating to valuation of Fund securities and determinations of the liquidity of such securities. According to the Statement of Additional Information attached to the Fund's prospectus, the Board formed a "Valuation Committee" that is "composed of the Trust's Chief Financial Officer, Controller and General Counsel," which from January 1, 2014 to present, was and is defendants Buono, Dugan, and Hall. The Board also formed a "Fair Value Committee" that is "composed of all Independent Trustees of the Trust"—that is, defendants Chapman, Franks, Kaier, Rakowski, Reinkemeyer, Shubik, and Walden. Other filings refer to a "valuation committee" consisting of "independent trustees," but such references appear to be to the Fair Value Committee.

35.     The Fund, through its registration statement, prospectus, and other documents incorporated by reference, committed to particular methodologies for valuing illiquid securities. The March 1, 2015 prospectus for the Fund, which is part of the Fund's February 27, 2015 registration statement, includes the following description of the Fund's policy on valuation:

> A Fund's investments are generally valued at market value, using market prices if available…. **Illiquid securities and other securities and assets for which market quotations are not readily available or are deemed unreliable are valued at "fair value", as determined in good faith by or in accordance with**

**procedures adopted by the Board of Trustees.** These types of assets can include high-yield bonds, defaulted securities and private investments that do not trade publicly, among other things. The Funds' procedures call for a valuation committee of the designated independent Trustees [i.e., the Fair Value Committee] to make a determination of fair value based on the committee members' or Trustees' judgments of relevant information and an analysis of the asset within the methodology approved by the Board of Trustees or between Board meetings, by designated independent Trustees.

2015 Prospectus at 37 (emphasis added). The same language appears in prior prospectuses for the fund that were in effect at least from January 1, 2014 to the present.

36.     A Statement of Additional Information attached and expressly incorporated by reference into the February 27, 2015 registration statement and prospectus explains further how illiquid securities will be valued:

Assets that are not considered to be readily marketable are valued by the Adviser [TAM] at fair value, **which is generally taken to be the amount for which the asset could be sold in an orderly disposition over a reasonable time period taking into account the nature of the asset**, under procedures established by and under the general supervision and responsibility of the Trust's Board. Fair valuation is inherently imprecise and becomes more so as the range and depth of market participants and information about the asset diminish. In determining fair value, the Adviser [TAM] reviews various factors to determine whether to value the asset on the basis of public markets, private transactions, an analytical method, or at cost.

February 27, 2015 Statement of Additional Information at 53 (emphasis added). As noted above, TAM was responsible for the valuations of illiquid securities, and the Board was responsible for the "supervision" of TAM's fair value determinations. The same statements on valuation also appeared in the Fund's previous Statements of Additional Information in effect at least from January 1, 2014 to the present.

37.     The February 27, 2015 Statement of Additional Information also detailed the role of the Valuation Committee (composed of defendants Buono, Dugan, and Hall) and the Fair Value Committee (composed of defendants Chapman, Franks, Kaier, Rakowski, Reinkemeyer, Shubik, and Walden) in the process of valuing the Fund's securities:

These Committees [the Valuation Committee and the Fair Value Committee] assist the Board in establishing valuation policies, in providing direction to the Adviser [TAM] regarding the principles of valuing certain securities or types of securities, and in reviewing valuations determined by the Adviser [TAM]. The Valuation Committee and a member of the Fair Value Committee meet or confer as needed between Board meetings.

38.     Notably, although the Board involved non-trustees in the security valuation process, applicable law does not permit the Board to fully delegate these responsibilities and required the Board to establish the fair value methodology and continuously review both the appropriateness of the methods used and the valuation findings resulting from such methods. *See* Accounting for Investment Securities by Registered Investment Companies, Accounting Series Release No. 118, 35 Fed. Reg. 19986, 19988-89 (Dec. 23, 1970). The Board's public statements described above confirm that the Board retained responsibility for the Fund's valuations of securities.

39.     The February 27, 2015 Statement of Additional Information also represented that the Fund adhered to a specific limit on its holding of illiquid securities and confirmed that the Board had primary responsibility for determining whether the Fund's securities were liquid to ensure the Fund's compliance with the cap on illiquid securities. It states:

> Under normal circumstances, **none of the Funds will purchase or otherwise acquire any investment if, as a result, more than 15% of its net assets (taken at current market value) would be invested in securities that are illiquid**. Generally speaking, an illiquid security is any asset or investment of which a Fund cannot sell a normal trading unit in the ordinary course of business within seven days at approximately the value at which a Fund has valued the asset or investment, including securities that cannot be sold publicly due to legal or contractual restrictions….

> Securities…may be treated as illiquid if they satisfy liquidity standards established by the [Trust's] Board of Trustees…. The continued liquidity of such securities may not be as well assured as that of publicly traded securities, and accordingly, **the Board will monitor their liquidity**. **The Board will review** pertinent factors such as trading activity, reliability of price information and trading patterns of comparable securities **in determining whether to treat any security as liquid for purposes of the foregoing 15% test**.

February 17, 2015 Statement of Additional Information at 12 (emphasis added). The Fund included the same policies on illiquid securities in Statements of Additional Information in effect at least from January 1, 2014 to the present and incorporated by reference into registration statements and prospectuses effective throughout the same period.

40.     Defendants also purported to disclose the percentage of the Fund's "illiquid" assets in the footnotes of its financial statements filed in its semi-annual and annual shareholder reports. Defendants repeatedly represented that the Fund complied with the 15% limit, indicating that illiquid securities accounted for 14.25% of the Fund's net assets of October 31, 2014, 12.22% as of April 30, 2015 and 13.40% as of October 31, 2015. October 31, 2014 Annual Shareholder Report at 77; April 30, 2015 Semi-Annual Shareholder Report at 59; October 31, 2015 Annual Shareholder Report at 79.

41.     The foregoing shareholder reports were incorporated by reference in the Fund's prospectuses and statements of additional information. The 2015 prospectus (at 47), for example, describes "financial highlights" for the Fund and states such "information should be read in conjunction with the financial statements and accompanying notes appearing in" a prior annual report to shareholders. Similarly, the last page of the 2015 prospectus states: "More information on the Third Avenue Funds is available free upon request, including the following: Shareholder Reports – Additional information about the Funds' investments is available in the Funds' Annual and Semi-Annual Reports to Shareholders…." And, the first page of the 2015 Statements of Additional Information state that while the "Statement of Additional Information (SAI) is not a Prospectus," it "should be read together with the Funds' Prospectus dated March 2, 2015. The Funds' Annual Report to Shareholders is incorporated by reference in this SAI (is legally considered part of the SAI)."

42.     Defendants' obligations to ensure the Fund did not purchase or acquire investments that would result in the Fund investing more than 15% of its net assets in illiquid securities aligns with SEC guidance for mutual funds. SEC guidelines generally limit an open-end fund's aggregate holdings of illiquid securities to 15% of a fund's net assets. Investment Company Act Rel. No. 18612 (Mar. 12, 1992) [57 FR 9828] (Mar. 20, 1992). Under the SEC's guidelines, an asset is considered illiquid if it cannot be sold or disposed of in the ordinary course of business within seven days at approximately the value at which the fund has valued the investment on its books. *Id.* (citing Investment Company Act Rel. No. 14983 (Mar. 12, 1986) [51 FR 9773] (Mar. 21, 1986)).

43.     In adopting its 15% guideline, the SEC explained as follows:

> To compute an accurate net asset value per share, a mutual fund must be able to value each portfolio security accurately. Mutual funds must use market price to value securities for which market quotations are readily available; the board of directors must make a good faith determination of the fair value of securities for which market prices are not readily available. If the net asset value of a mutual fund is not accurate, purchasing or redeeming shareholders may pay or receive too little or too much for their shares, and the interests of remaining shareholders may be overvalued or diluted.

> To meet these requirements, a mutual fund must maintain a high degree of portfolio liquidity…. The Commission believes that a 15% standard should satisfactorily assure that mutual funds will be able to make timely payment for redeemed shares. Experience has shown that mutual funds generally have not had difficulty in meeting redemption requests from available cash reserves, even during times of abnormally high selling activities in the securities markets. Even if a fund were forced to sell securities to meet redemption requests, substantially all of its remaining assets would be required to be liquid securities which it could sell consistent with appropriate portfolio management.

*Id.*

44.     The SEC also made clear that its adoption of the 15% guideline did not "relieve a fund from the requirements concerning valuation and the general responsibility to maintain a level of portfolio liquidity that is appropriate under the circumstances." *Id.* According to the SEC:

> If no market quotations for an illiquid security are available, the board of directors of the fund will be required to determine the fair value of the security. In addition,

the Commission expects funds to monitor portfolio liquidity on an ongoing basis to determine whether, in light of current circumstances, an adequate level of liquidity is being maintained. For example, an equity fund that begins to experience a net outflow of assets because investors increasingly shift their money from equity to income funds should consider reducing its holdings of illiquid securities in an orderly fashion in order to maintain adequate liquidity.

*Id.*

45.     In addition to the Fund's own public statements concerning the responsibilities for the monitoring of illiquid investments, federal regulations confirm that a Fund's board of directors (or, in this case, Board of Trustees) is responsible for determining a security's liquidity. Resale of Restricted Securities; Changes to Method of Determining Holding Period of Restricted Securities Under Rules 144 and 145, Investment Company Act Release No. 17452, 55 Fed. Reg. 17933, 17940 (Apr. 30, 1990).

46.     TAM had additional contractual duties to the Fund. Article 2(b) of the Investment Advisory Agreements between TAM and the Trust stated that TAM would abide by these standards in managing the Fund. Specifically, the agreement provides that:

> In the performance of its duties under this Agreement, the Adviser [TAM] shall at all times use all reasonable efforts to conform to, and act in accordance with, any requirements imposed by (i) the provisions of the Investment Company Act of 1940, as amended (the "Act"), and of any rules or regulations in force thereunder; (ii) any other applicable provisions of the law; (iii) the provisions of the Trust Instrument and By-Laws of the Trust…; (iv) the investment objective, policies and restrictions applicable to the Fund as set forth in the Fund's Prospectus (including its Statement of Additional Information) and (v) any policies and determinations of the Board of Trustees of the Trust.

47.     TAM earned tens of millions of dollars in fees from the Fund for the provision of advisory, management and related services. For example, for the fiscal year ended October 31, 2015, the Fund paid approximately $23 million in fees and expenses, primarily to TAM and its employees. Similarly, for the fiscal year ended October 31, 2014, the Fund paid approximately $29 million in fees and expenses, primarily to TAM and its employees.

*The Fund Failed to Reduce the Valuation of Its Securities and the Liquidity Composition of its Portfolio When Bond Liquidity Dropped Since 2003*

48.     Beginning in early 2014, the fixed income markets experienced increased volatility, which led to substantial outflows of investor money from mutual funds. As the junk bond market experienced negative trends in the summer of 2014 and redemptions picked up, the Fund entered a "death spiral" of its own making. While the Fund continued to state a policy of complying with the SEC's 15% liquidity rule, the Fund found it could not sell its assets at the values the Fund attributed to them. This caused the Fund to sell its most liquid assets to cover investor redemptions, thereby increasing its concentration of illiquid and underperforming assets and further impairing its ability to meet future redemptions. By early December 2015, the Fund was down 27% on the year, compared to less than 4% for high-yield funds as a category, according to Morningstar.

49.     The SEC recognized these problems in a "Fixed Income Guidance Update" it issued in January 2014, indicating that "the 10-year Treasury note yield rose by almost 50 bps, bond fund prices fell, and bond mutual funds and ETFs experienced net outflows of $68 billion (approximately 1.8% of aggregate assets)." SEC Division of Investment Management Guidance Update, January 2014, No. 2014-01, at 2. The SEC further acknowledged that:

> This apparent reduction in market-making capacity may be a persistent change, to the extent it is resulting from broader structural changes such as fewer proprietary trading desks at broker-dealers and increased regulatory capital requirements at the holding company level. A significant reduction in dealer market-making capacity has the potential to decrease liquidity and increase volatility in the fixed income markets.

*Id.* at 4. In light of the " potential fixed income market volatility, which may be exacerbated by changes in bond market size and structure discussed above," the SEC advised fund managers to "assess and stress test" fund liquidity and conduct "risk management" evaluations. It also advised mutual funds to "assess the adequacy of their disclosures to shareholders in light of any additional

risks due to recent events in the fixed income markets and the potential impact of tapering quantitative easing and/or rising interest rates, including the potential for periods of volatility and increased redemptions." *Id.* at 4-5.

50.     The same issues concerning increased volatility in the fixed income markets and liquidity risks were discussed extensively in the news from 2014 through 2015, for example in the following publications:

- Seeking Alpha, *High-Yield Bonds: Do Current Risks Outweigh Returns?*, by George Putnam, February 13, 2014 -- Defaults will begin to increase soon. The high-yield bond market is very sensitive to Federal Reserve announcements regarding tapering of bond purchases and raising rates, experiencing both "sharp declines" and quick recoveries. "I feel that the longer the current boom in high yield continues, the greater risk of negative surprises," current holders are "not being paid enough to take on these risks."

- Seeking Alpha, *Why Income Investors Should Be Watching High Yield Bond ETFs*, by David Fabian, July 17, 2014 – "Summary- High yield bonds ETFs are starting to show signs of weakness that may mark a turning point. Recent Federal Reserve comments point to the potential of a bubble in high yield bonds."

- Investment News, *For fund managers, high-yield pullback comes with liquidity risks*, by Trevor Hunnicutt, August 4, 2014 -- Money is "still pouring out" of high-yield bond funds, during the past three weeks, "investors have pulled $5.5 billion." Regulators, fund managers, and market participants alike "worry that high-yield- and other bond market sectors - could become more treacherous as a growing retail segment looks to withdraw money just as core liquidity providers have stepped out of the market." The article refers to the current "lower liquidity environment" and draws comparisons to past "redemption cycles." After the 2013 "taper tantrum" the SEC advised fund firms to conduct "additional stress tests on liquidity."

- Financial Times, *Unwary yield hunters risk liquidity trap - Sell early to avoid rush for high-yield exit as Fed QE ends*, by Alberto Gallo, August 11, 2014 – "Yields are near record lows and liquidity in secondary markets is declining, making it harder to exit swiftly. Reducing exposure earlier could be a wise decision." . . . "Regulators have already raised red flags. The International Monetary Fund highlighted weaknesses in high-yield bonds and leveraged loans in its latest assessment of the US economy, warning of 'a tail risk' where there was a precipitous attempt by investors to exit certain markets perhaps exacerbated by outflows from ETFs and mutual funds as well as near-term market illiquidity." ... "High-yield bonds have sold off over the past few days, but could get even worse if the Fed turns more hawkish. Liquidity in secondary markets is evaporating, and policy makers are shifting their focus to credit markets."

- <u>BlackRock Blog</u>, *What's Driving the Recent High Yield Sell-Off?*, by Matthew Tucker, August 12, 2014 – "In the past few weeks we have seen some cracks in the high yield picture. Elevated geopolitical risk, an Argentina default and US jobs report that was weak relative to expectations contributed to the sell-off ... From June 30th to August 6th, high yield bond ETFs experienced $3.7 billion of redemptions ... since June 30th, the high yield bond market has lost about 2% ... The recent sell-off is also a good reminder to investors of the potential volatility of the asset class."

- <u>Financial Times</u>, *Headwinds to slow US high-yield debt sales*, by Vivianne Rodrigues and Andrew Bolger, January 8, 2015 -- The outlook for high-yield debt sales "in the next coming months is much less rosy .... The relentless drop in oil prices and a spike in market volatility in the past quarter has weighed heavily on high-yield debt. The rise in yields to multiyear highs has failed to attract new buyers, with funds and exchange traded funds investing in the bonds experiencing hefty redemptions and pushing borrowing costs up." ... "'High-yield volatility and supply are fairly well correlated, and we anticipate a more volatile high-yield market [in 2015],' Barclays analysts say in a note to clients."

51.     In light of the foregoing, Defendants should have begun in 2014 reducing the valuation of the Fund's securities to reflect increasing volatility and reduced liquidity, and they should have closely reevaluated the liquidity of the Fund's assets to ensure no more than 15% of such assets were illiquid during that period. Defendants, however, did not do so, thus violating the obligations regarding assets value and the percentage of illiquid assets.

*The Suspension of Redemptions, Closure and Liquidation of the Fund*

52.     In the months leading up to December 9, 2015, and in the wake of increasing volatility in the fixed income markets, the Fund's performance deteriorated and the number of investor redemptions rapidly mounted. According to a notice of application and temporary order that the Trust and TAM filed with the SEC on December 16, 2015, the Fund experienced a total of $1.1 billion in estimated net outflows for the year 2015 through December 9, 2015, which was more than half the value of its assets as of the beginning of 2015. The Fund asserts that it was unable to meet further redemptions without selling assets at prices substantially lower than the prices at which Defendants had valued the Fund's assets.

53.     As a result, on December 9, 2015, shareholders in the Fund received a letter from TAM notifying them that the Board of Trustees of the Trust had decided to liquidate the Fund, which as of that time had assets of $788.5 million. The Board of Trustees indicated it would put the Fund's assets into a liquidating trust. This action stopped all shareholder redemptions, converting shares in the Fund to units in a liquidating trust that investors could not sell.

54.     This move – to freeze withdrawals from the Fund, a mutual fund – was highly unusual and unexpected. A mutual fund is required on request to return investor money at net asset value on a daily basis. *See*, *e.g.,* Investment Company Act Rel. No. 18612 (Mar. 12, 1992) [57 FR 9828] (Mar. 20, 1992) ("Under the 1940 Act, mutual funds must stand ready to redeem shares daily and pay redeeming shareholders within seven days of receiving a redemption request. In addition, a mutual fund must compute its net asset value each business day and give purchase and redemption orders the price next computed after receipt of an order") (citing 15 U.S.C. 80a-22(e) and 17 CFR 270.22-c-1(a)). To suspend redemptions, a mutual fund must first obtain regulatory approval from the SEC, which the Fund did not do prior to December 9. Indeed, in the Trust's filing with the SEC on December 16, 2015, it acknowledged expressly that "only the Commission has the authority to suspend redemptions."

55.     On the heels of this closing of the Fund, the Trust and TAM fired their long term CEO, Defendant Barse. At the same time, the SEC undertook a review of and expressed concerns regarding Defendants' actions and the Fund's liquidation.

56.     On December 16, 2015, the Trust and TAM sought and received an order from the SEC suspending the right of redemption with respect to shares of the Fund effective December 10, 2015 until the Fund completes the liquidation of its portfolio securities or the SEC rescinds its

order. The assets of the Fund were then returned to the Fund from the liquidating trust, and the Fund is in the process of being liquidated.

*Defendants' Breaches of Fiduciary and Contractual Duties*

57.     At all relevant times, under Delaware law, the Defendants were under a fiduciary duty to act with loyalty, good faith, and due care towards the Fund. The Defendants had a duty to manage prudently the assets placed in the Trust, within the parameters provided by the trust instrument and other Fund documents, including the Fund prospectus.

58.     Defendants, since the beginning of 2014, breached their fiduciary duties to the Fund in multiple ways, including by (i) failing to value the Fund's investments in illiquid securities according to "fair value"; (ii) substantially exceeding the Fund's self-imposed limitation that the Fund would invest no more than fifteen percent (15%) of its net assets in illiquid securities; and (iii) failing to actively and continually monitoring the liquidity of the Fund's assets.

59.     As noted, the Board of Trustees, in conjunction with its "Valuation Committee" composed of defendants Buono, Dugan, and Hall, and the "Fair Value Committee," composed of the independent Trustees (defendants Chapman, Franks, Kaier, Rakowski, Reinkemeyer, Shubik, and Walden), were responsible for determinations of fair value of illiquid securities. These Defendants, however, failed to value properly illiquid securities at fair value, beginning approximately at the beginning of 2014, when the bond market began to deteriorate but Defendants failed to adjust their valuations of securities in light of such market changes.

60.     By their own admission, Defendants closed the Fund because the Fund could not meet redemptions due to the illiquidity of much of its high yield debt. The Fund could not sell those securities for the amounts at which the Fund had valued the securities, strongly indicating that the valuations were significantly overstated, which in turn impeded the Fund from selling assets as necessary to honor redemptions.

61.     Notably, the redemptions did not occur all at once, but occurred gradually over many months. This means that had the Fund's "fair value" determinations of illiquid securities been accurate, the Fund would have had more than sufficient opportunity to liquidate such securities at the "fair value" the Fund assigned to them—i.e., the price for which the securities could be sold within a "reasonable time period." We now know that the Fund was unable to liquidate such securities even over months of time, thus confirming that the Fund's valuation of securities was significantly higher than the securities' true "fair value."

62.     Industry commentators and analysts have concluded that the Fund's securities were obviously substantially overvalued. One commentator indicated that "the stated valuations were nowhere near what they were really worth." The Street, Here's Why Third Avenue Focused Credit Fund Barred Redemptions, Jim Cramer (Dec. 14, 2015). And another explained that "for a long period of time, the board has been blessing portfolio valuations that are hard to defend…." Seeking Alpha, Third Avenue Focused Credit Fund - Designed To Implode (Dec. 14, 2015).

63.     As to the limit that the Fund invest no more than 15% of its net assets in illiquid securities, Defendants caused the Fund to persistently violate that restriction beginning approximately in 2014 when, because of tumult in the bond market, many of the Fund's securities became illiquid—certainly more than 15%. Defendants concealed their failure to abide by the restrictions on holdings of illiquid securities by representing in shareholder reports specific percentages of illiquid securities as a portion of the fund's assets, but these representations were false, and it is now clear that the Fund invested a much greater portion of its net assets in illiquid securities than the Fund represented.

64.     Defendants' failure to abide by the 15% cap on illiquid securities is confirmed by the Fund's inability to meet redemptions because of such illiquid assets. Because the Fund

committed to invest no more than 15% of fund assets in illiquid securities, it follows that the Fund would always invest at least 85% in liquid securities—i.e., securities that could be sold "within seven days." Logically, therefore, if the Fund had invested no more than 15% of its assets in illiquid securities, it should have had no problem satisfying redemption requests totaling up to 85% of the fund's assets. Critically, the Board of Trustees froze redemptions in the Fund long before 85% of the Fund's value was redeemed; the Fund's total assets dropped by only a little more than half during 2015. In short, the investment and redemption history of the Fund makes clear that the Fund invested much more than 15% in illiquid securities.

65.     Independent analysis has concluded that the Fund substantially exceeded its 15% limit on illiquid securities: "At least one-fifth of Third Avenue Focused Credit Fund, with less than $1 billion under management, was composed of illiquid assets, meaning they trade so infrequently that they don't have a market price, according to a Reuters analysis. That's one of the highest percentages of exposure in the junk bond sector." Tim McLaughlin, *Third Avenue Junk fund blowup exposes risks of unsellable assets*, Reuters (Dec. 12, 2015).

66.     The Fund was so highly concentrated in illiquid securities that it never should have operated as a mutual fund. "'That particular fund was a bit of an anomaly from the standpoint of it was really a wolf in sheep's clothing, so to speak,'" said Bradley Tank, chief investment officer of fixed income at Neuberger Berman, speaking on a conference call about his firm's 2016 outlook. "'You have a fund that has traditionally been invested in a way that's probably more consistent with what a distressed investor would do in a private equity-like framework, with lockup provisions and so on—not necessarily consistent with managing a 40 Act fund that requires daily liquidity.'" *See* Diana Britton, *Neuberger Berman: Third Avenue Fund Managed Like Private Equity*, WealthManagement.com (Dec. 17, 2015).

67.     "Bruce Richards, chief executive officer of Marathon Asset Management, called managers of Third Avenue Management 'triple-C cowboys' for loading up on hard-to-sell unrated and low-rated bonds. 'The big picture is that mutual funds are offering daily liquidity, so they have to be very strongly managed with cash balances, lines of credit, good, quality names that you can trade in the marketplace when you need to sell, as opposed to what Third Avenue was doing,' Richards said Friday in a television interview on 'Bloomberg <GO>." *See* Ben Steverman, Bruce Richards Calls Third Avenue Management 'Triple-C Cowboys', Bloomberg Business (Dec. 18, 2015).

68.     "The event also raises questions about whether Third Avenue's focus on extremely risky and difficult to trade assets was really appropriate given the fact that mutual funds promise investors the ability to take their money out whenever they wish. 'It is irresponsible to run the fund in such a way that they can't meet redemptions,' said Leo Acheson, an analyst at Morningstar." *See* Matt Egan, CEO exits after mutual fund implodes, CNN Money (Dec. 14, 2015).

69.     The accumulation of illiquid assets not only violated SEC guidance and the Fund's publicly stated policies; it was extremely reckless. As the Fund became "the largest holder of certain loans and securities that traded infrequently" and then went to sell these assets, "savvy traders…quickly figured out that a large investor was under pressure to sell" and offered "lowball bids for some of its assets, which would have caused it to absorb big losses if it sold at those prices." *See* The Wall Street Journal, "Third Avenue CEO Barse Departs," December 14, 2015.

70.     Defendants also violated their obligation to monitor the liquidity of Fund. Defendants abdicated their duties to monitor liquidity and began a concerted, prolonged failure to measure illiquid assets at their "fair value" and to limit the fund's investments in illiquid securities to no more than 15% of the Fund's net assets, pursuant to the Fund's publicly stated policies.

*The Aftermath of Defendants' Failures to Properly Value Securities and to Limit the Holding of Illiquid Securities.*

71.     Beginning in approximately July 2014, the Defendants began reducing the valuations of the Fund's securities, and thus, reducing the NAV for the Fund. The Fund's NAV fell precipitously in the second half of 2015 as the Fund was forced to reduce the value of its securities downward to begin to approach the reality of the fair value of such securities.

72.     The reductions in the Fund's NAV far exceeded the reductions in similar high-yield bond funds, confirming that the reductions were not caused by market forces or changes in the actual fair value of the Fund's securities, but instead by the Fund's modifications of its valuations to approach the reality of the fair value of the securities. This is reflected in the below chart, which compares the performance of the Fund (the blue line) relative to other high yield bond funds from July 1, 2014 until early 2016:



## Derivative and Demand Futility Allegations

73.     As noted above, Broccolino brings the present complaint based on his counsel's investigation and otherwise based upon information and belief. Broccolino has served upon the Trust a books and records demand pursuant to Section 3189 of the Delaware Statutory Trust Act, which he attaches to this complaint as **Exhibit A**. The Trust has committed to producing documents in response to Mr. Broccolino's demand but has not yet done so. The correspondence between Broccolino's counsel and the Trust is attached hereto as **Exhibit B.** Because the Trust has not yet produced documents in response to Broccolino's demand, Broccolino alleges facts herein supporting demand futility without the benefit of his books and records demand.

74.     Although Mr. Broccolino's factual allegations herein are sufficient to allege the futility of a demand upon the Trust's Board of Trustees, Mr. Broccolino believes that the documents the Trust produces in response to his books and records demand will bolster his allegations relating to demand futility. Mr. Broccolino therefore will amend this complaint based on the results of his books and records demand when the Trust responds to it.

75.     Broccolino brings this action derivatively for the benefit of the Fund to redress injuries the Fund has suffered and injuries continues to suffered as a direct and proximate result of the misconduct alleged herein. The Trust is a nominal defendant solely in a derivative capacity.

76.     Broccolino will represent fairly and adequately the interests of the shareholders in enforcing and prosecuting their rights, as reflected in Broccolino's pursuit of a books and records demand against the Fund, which will provide additional documents and information that will bolster Broccolino's allegations in this complaint.

77.     Broccolino is not using this action to gain any personal advantage, nor does Broccolino maintain any personal agenda other than seeking to remedy the harm that Defendants

have caused. To this end, Broccolino has taken steps to file this action and has retained counsel experienced in derivative litigation and corporate governance actions.

78.     Broccolino did not make a pre-suit demand on the Board of the Trust to take remedial action on behalf of the Fund against the Defendants because such a demand would have been a futile, wasteful, and useless act. Specifically, each of the Trustees participated in, approved of, and/or permitted the wrongs alleged in.

79.     The current trustees of the Trust are defendants Whitman, Chapman, Franks, Kaier, Rakowski, Reinkemeyer, Shubik, and Walden. Each of these current trustees were trustees during all our substantial part of the wrongdoing alleged herein. Defendant Reinkemeyer joined the Board on January 20, 2015; all other trustees named as defendants in this complaint joined the Board prior to January 1, 2014.

80.     Defendants were responsible for the Fund's valuation of securities, liquidity determinations, and monitoring of the same. Specifically, all Defendants, including the Trustees, were responsible for valuations of the Fund's securities. The Fund's prospectus confirms that a "committee of the designated independent Trustees [i.e., the Fair Value Committee]" is responsible for "determination[s] of fair value" of illiquid securities, that the Valuation Committee would "provid[e] direction" to TAM and "review" the valuations performed by TAM, and finally, that the entire Board would retain "general supervision and responsibility" for valuation decisions.

81.     With respect to compliance with the Fund's 15% cap on illiquid securities, the Fund's prospectus confirms that the entire Board was responsible for setting "standards" for identifying illiquid investments and "monitoring" compliance with the cap on illiquid investments.

82.     As set forth above, the Fund plainly did not value illiquid securities according to fair value and that the Fund flouted its obligation to limit illiquid investments to 15% of the Fund's

net assets. Each of the Trustees had direct responsibility for both the valuations and liquidity determinations at issue. By failing to perform their duties as Trustees, the Trustees face significant personal liability for claims brought by the Fund against them.

83.     Notably, the Fund has appointed no new directors to the Board since January 20, 2015, when defendant Reinkemeyer joined the Board. All of the other Trustees named in this complaint as defendants joined the board prior to January 1, 2014. The only other change to the Board between January 1, 2014 and the present was the departure of David Barse from the Board on December 22, 2015. That is, the Trust has not modified the composition of its board at all since the events herein such that it could form a committee of disinterested trustees. Rather, **each** Trustee faces substantial liability for his or her breaches of fiduciary duties and is therefore directly conflicted by the substantial prospect for personal liability. **No** member of the current Board is either disinterested or independent.

84.     Many of the Trustees are conflicted for additional reasons; some are person friends of Whitman, while others obtain a substantial portion of their income from serving on the Board:

a.     Defendant Whitman is the founder, Chairman, and portfolio manager at TAM and is considered by the Trust to be an "interested trustee" under the ICA, and cannot be independent and disinterested given his economic and reputational interests in connection with the Trust, TAM, and the Fund.

b.     Defendant Chapman cannot be disinterested because Chapman sits on the board of a number of funds affiliated with the majority owner of TAM, Affiliated Management Group ("AMG"). Chapman received over $500,000 in fees in 2014 alone form his service on AMG-affiliated funds and therefore would not be able to consider a demand against the interests of TAM, an affiliate of AMG.

c.      Defendant Franks' background is that of a journalist, with little-to-no relevant experience in the field of financial services. Furthermore, Franks' income from the Trust and another trust associated with TAM, which totaled $85,000 in 2014 alone, represents a material source of income when considered against Franks' income as a journalist. In addition, Franks's husband, Robert M. Morgenthau, is a close friend of defendant Whitman and has received substantial contributions from Whitman when running for political office.

d.      Defendant Kaier, like defendant Chapman, sits on the board of a number of AMG-affiliated mutual funds, and in 2014 alone, received over $400,000 in fees from his service on such funds, and therefore would not be able to consider in an independent and disinterested manner a demand against the interests of an AMG affiliate such as TAM.

e.      Defendant Rakowski likewise sits on the board of multiple AMG-affiliated funds and received $450,000 in 2014 alone from his service on such fund boards. This compensation reflects a material source of income, when considered against his income serving as the partner of a small Pennsylvania law firm.

f.      Defendant Shubik has been a friend of Whitman's since graduate school, regularly plays poker with him, and co-authored a book with him in 2005. Shubik has been a Trustee for the Trust and another TAM-affiliated trust since 1999 and 1990 respectively; he has thus worked with Whitman now for more than twenty-five years. Shubik's income from serving as a trustee of TAM-affiliated trusts totaled $85,000 in 2014 alone, and thus is material income in relation to his income as a university professor.

g.      Defendant Walden has served as a Trustee of the Trust and the another TAM-affiliated trust since 1999 and 1996, respectively, and has now worked with

Whitman for twenty years. Walden also assisted Whitman with a book published in 2000 called "Value Investing: A Balanced Approach."

While some of these issues on their own might not constitute disabling conflicts, when considered in light of the fact that the Trustees each had responsibility for preventing the wrongs described herein and therefore face substantial individual liability in this case, the fact that the Board is filled with Whitman's personal friends who derive substantial financial benefit from their membership on the Board of the Fund and other AMG-affiliated funds, supports the conclusion that the Trustees are unable to independently consider claims against the Defendants.

85.     In short, it would be futile to make a demand on the Trustees to sue themselves. It was the Trustees' own breaches of fiduciary duty and their gross negligence in failing to ensure the Fund's compliance with policies on valuation and holdings of illiquid securities that led to substantial harm to the Fund.

86.     The Trustees are each conflicted personally and directly by their actions such that no investor could reasonably expect them to respond to a demand in good faith. They are not disinterested parties and lack sufficient independence to exercise business judgment in the best interests of the Fund's shareholders.

87.     For the foregoing reasons, demand is excused.

## COUNT I

### Breach of Fiduciary Duty

### (Against All Defendants)

88.     Broccolino incorporates by reference the allegations in each of the foregoing paragraphs as if fully set forth herein.

89.     Defendants, who were the members of the Board of Trustees, officers that participated on the Valuation Committee, and the investment advisor to Fund, each owed fiduciary

duties of care to the Fund in managing the Fund's affairs. The duties are and were set forth in the Trust instrument and the Trust's prospectus and other public filings.

90.     Defendants each breached their fiduciary duties to the Fund by (i) failing to value the Fund's investments in illiquid securities according to "fair value"; (ii) substantially exceeding the Fund's self-imposed limitation that the Fund would invest no more than fifteen percent (15%) of its net assets in illiquid securities; and (iii) failing to actively and continually monitoring the liquidity of the Fund's assets. Defendants were each reckless and grossly negligent in the performance of their duties to the Fund.

91.     Broccolino made no demand on the Board because such demand would be futile, given that each member of the Board is subject to substantial personal liability for the wrongs alleged herein.

92.     As a direct and proximate result of the breaches of fiduciary duty by Defendants, the Fund has sustained substantial harm and damage, for which Defendants are liable to the Fund.

93.     There is no adequate remedy at law.

## COUNT II

### Breach of Contract

### (Against defendant Third Avenue Management LLC)

94.     Broccolino incorporate by reference the allegations in each of the foregoing paragraphs as if fully set forth herein.

95.     TAM had additional contractual duties to shareholders and the Fund. Article 2(b) of the Investment Advisory Agreements between TAM provide that:

> In the performance of its duties under this Agreement, the Adviser [TAM] shall at all times use all reasonable efforts to conform to, and act in accordance with, any requirements imposed by (i) the provisions of the Investment Company Act of 1940, as amended (the "Act"), and of any rules or regulations in force thereunder; (ii) any other applicable provisions of the law; (iii) the provisions of the Trust

Instrument and By-Laws of the Trust…; (iv) the investment objective, policies and restrictions applicable to the Fund as set forth in the Fund's Prospectus (including its Statement of Additional Information) and (v) any policies and determinations of the Board of Trustees of the Trust.

96.     TAM breached its agreement in multiple ways. Among them, it (i) failed to ensure the Fund's conformance with applicable law concerning limits on the holding of illiquid securities by mutual fund; and (ii) failed to ensure the Fund's conformance with its policies and restrictions as set forth in the Fund's prospectus, including the valuation of illiquid securities at fair value and the limit on holdings of illiquid securities to 15% of the Fund's net assets.

97.     TAM's breaches proximately caused harm to the Fund.


## PRAYER FOR RELIEF

WHEREFORE, Broccolino prays for relief and judgment, as follows:

A.     Declaring that this action is a proper derivative action;

B.     Ordering each of the Defendants to pay restitution and/or compensatory damages in favor of the Fund, plus prejudgment interest.

C.     Ordering that Third Avenue Management LLC return all management fees, broker/dealer fees and other fees paid by the Fund during the period that it breached its fiduciary duties;

D.     Awarding Broccolino the reasonable costs and attorneys' fees incurred by his counsel for the benefit of the Fund; and

E.     Awarding such other and further relief as the Court may deem just and proper.


## DEMAND FOR JURY TRIAL

Broccolino demands a jury trial on all counts so triable.

Dated: April 1, 2016

Respectfully submitted,

*/s/ Thomas V. Urmy, Jr.*_____
SHAPIRO HABER & URMY LLP
Thomas V. Urmy, Jr.
2 Seaport Lane
Boston, MA 02210
Telephone: (617) 439-3939
Facsimile: (617) 439-0134
turmy@shulaw.com

**Counsel for Plaintiff Livio Broccolino**

## **VERIFICATION**

I, Livio Broccolino, hereby verify as follows:

1.      I have reviewed the Complaint prepared on my behalf, and I authorized its filing.

2.      I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation, and for that reason believe them to be true.

3.      I am a current holder of shares in the Third Avenue Focused Credit Fund, a series of Third Avenue Trust, and have been a holder of such shares continuously at all times relevant to the complaint.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 1st day of April 2016 in Towson, Maryland.



Livio Broccolino

**Exhibit A**

Livio Broccolino
713 East Seminary Avenue
Towson, MD 21286

March 11, 2016

**Federal Express – Overnight Delivery**
Third Avenue Trust
622 Third Avenue
New York, New York 10017
**Attention:   Mr. David Resnick, President**

     **Re:     Demand Pursuant To 12 Del. C.  § 3819**

Dear Mr. Resnick:

     I am the beneficial owner of 8,817.246 shares of the Third Avenue Focused Credit Fund (the "Fund"), a series of Third Avenue Trust ("TAT"), whose investment advisor is Third Avenue Management LLC ("TAM"). I enclose a true and accurate copies of brokerage account statements confirming my beneficial ownership of these shares. Pursuant to Section 3819 of the Delaware Statutory Trust Act ("DSTA"), I demand the right to inspect and copy the documents described herein.

     The recent suspension of redemptions in, and closure and liquidation of, the Fund in December 2015 raised serious questions regarding whether TAT's Board of Directors ("Board"), its Senior Officers, and TAM have acted in accordance with their fiduciary and contractual obligations.

     ***First***, I am concerned that the Fund's investments in illiquid securities were not valued according to "fair value" and that the values assigned to illiquid securities substantially exceeded those securities' "fair value." The Fund set forth specific policies in its registration statement, prospectus, and other documents concerning the Fund's methodology for valuing illiquid securities. The March 1, 2015 prospectus for the Fund, which is part of the Fund's February 27, 2015 registration statement, includes the following description of the fund's methodology for valuing securities:

     A Fund's investments are generally valued at market value, using market prices if available…. **<u>Illiquid securities and other securities and assets for which market quotations are not readily available or are deemed unreliable are valued at "fair value", as determined in good faith by or in accordance with procedures adopted by the Board of Trustees</u>**. These types of assets can

March 11, 2016
Page 2

include high-yield bonds, defaulted securities and private investments that do not trade publicly, among other things. The Funds' procedures call for a valuation committee of the designated independent Trustees to make a determination of fair value based on the committee members' or Trustees' judgments of relevant information and an analysis of the asset within the methodology approved by the Board of Trustees or between Board meetings, by designated independent Trustees.

March 1, 2015 Prospectus at 37 (emphasis added). The same language appears in prior prospectuses for the Fund.

A Statement of Additional Information attached to the February 27, 2015 registration statement and prospectus explains further how the Fund will value illiquid securities:

Assets that are not considered to be readily marketable are valued by the Adviser at fair value, **which is generally taken to be the amount for which the asset could be sold in an orderly disposition over a reasonable time period taking into account the nature of the asset, under procedures established by and under the general supervision and responsibility of the Trust's Board**. Fair valuation is inherently imprecise and becomes more so as the range and depth of market participants and information about the asset diminish. In determining fair value, the Adviser reviews various factors to determine whether to value the asset on the basis of public markets, private transactions, an analytical method, or at cost.

See February 27, 2015 Statement of Additional Information at 53 (emphasis added). The same rules on valuation also appeared in the Fund's previous Statements of Additional Information.

Beginning at the outset of 2013, the high-yield bond markets experienced increased volatility, which led to substantial outflows of investor money from mutual funds. At the beginning of the year, a January 10, 2013 Bloomberg article sounded the alarm of rapidly decreasing liquidity in the bond market. Bloomberg reported: "Liquidity has been stifled as some investors hoard bonds with prices rising 4 percent last year [2012], the most since 2009, and as dealers reduce inventories in response to risk-curbing regulations aimed at averting another credit seizure."

Shortly thereafter, a wave of redemptions hit high yield bond mutual funds. Another Bloomberg article published on January 30, 2013, pointed to additional valuation problems in the high-yield bond market. It quoted a prominent fund manager stating that "[h]igh-yield is as overbought as [he has] even seen it," and that the market "is absolutely, from a valuation point, ridiculous."

It was not only the financial press that warned of reduced liquidity in high yield bonds. The SEC recognized the same thing in a "Fixed Income Guidance Update" it issued in January 2014, indicating that in June 2013, "the 10-year Treasury note yield rose by almost 50 bps, bond fund prices fell, and bond mutual funds and ETFs experienced net outflows of $68 billion

March 11, 2016
Page 3

(approximately 1.8% of aggregate assets)." SEC Division of Investment Management Guidance Update, January 2014, No. 2014-01, at 2. The SEC further acknowledged that:

> This apparent reduction in market-making capacity may be a persistent change, to the extent it is resulting from broader structural changes such as fewer proprietary trading desks at broker-dealers and increased regulatory capital requirements at the holding company level. A significant reduction in dealer market-making capacity has the potential to decrease liquidity and increase volatility in the fixed income markets.

*Id.* at 4. In light of the "potential fixed income market volatility, which may be exacerbated by changes in bond market size and structure discussed above," the SEC advised fund managers to "assess and stress test" fund liquidity, conduct "risk management" evaluations and "assess the adequacy of their disclosures to shareholders in light of any additional risks due to recent events in the fixed income markets and the potential impact of tapering quantitative easing and/or rising interest rates, including the potential for periods of volatility and increased redemptions." *Id.* at 4-5.

The same issues concerning increased volatility in the high-yield bond markets and liquidity risks were discussed extensively in the news from 2013 through 2015, for example in the following publications:

- The Economist, *High-yield bonds, An appetite for junk*, from the print edition, October 19, 2013 – "But not all is sunny in the high-yield world. Although the market has doubled or tripled in size since 2008, liquidity has diminished.... PIMCO, a huge bond fund manager, said in a recent report, '[w]e see reduced liquidity as an important secular (three- to five-year) trend...[which] will result in higher volatility in times of stress.' In other words, if investors ever lose their current enthusiasm for high-yield bonds, they will find it much harder, and probably costlier, to offload them."

- Seeking *Alpha, High-Yield Bonds: Do Current Risks Outweigh Returns?*, by George Putnam, February 13, 2014 – Defaults will begin to increase soon. The high-yield bond market is very sensitive to Federal Reserve announcements regarding tapering of bond purchases and raising rates, experiencing both "sharp declines" and quick recoveries. "I feel that the longer the current boom in high yield continues, the greater risk of negative surprises," current holders are "not being paid enough to take on these risks."

- Financial *Times, Unwary yield hunters risk liquidity trap - Sell early to avoid rush for high-yield exit as Fed QE ends*, by Alberto Gallo, August 11, 2014 – "Yields are near record lows and liquidity in secondary markets is declining, making it harder to exit swiftly. Reducing exposure earlier could be a wise decision.... Regulators have already raised red flags. The International Monetary Fund highlighted weaknesses in high-yield bonds and leveraged loans in its latest assessment of the US economy, warning of 'a tail risk' where there was a precipitous attempt by investors to exit certain markets perhaps exacerbated by outflows from ETFs and mutual funds as well as near-term market illiquidity.... High-yield bonds have sold off over the past few days, but could get even

March 11, 2016
Page 4

worse if the Fed turns more hawkish. Liquidity in secondary markets is evaporating, and policy makers are shifting their focus to credit markets."

- Financial Times, *Headwinds to slow US high-yield debt sales*, by Vivianne Rodrigues and Andrew Bolger, January 8, 2015 – The outlook for high-yield debt sales "in the next coming months is much less rosy…. The relentless drop in oil prices and a spike in market volatility in the past quarter has weighed heavily on high-yield debt. The rise in yields to multiyear highs has failed to attract new buyers, with funds and exchange traded funds investing in the bonds experiencing hefty redemptions and pushing borrowing costs up…. 'High-yield volatility and supply are fairly well correlated, and we anticipate a more volatile high-yield market [in 2015],' Barclays analysts say in a note to clients."

In light of the foregoing, the Fund should have begun in 2013 reducing its valuation of the Fund's securities to reflect increasing volatility and reduced liquidity. Recent events indicate strongly that the Fund did not do so. The dramatic drop in the Fund's net asset value both prior to and after the suspension of redemptions and closure far exceed the decline in net asset values of other mutual funds with investments similar to the Fund, indicating that the Fund did not value its illiquid securities at their fair value.

The Fund's Statement of Additional Information indicates that a Valuation Committee composed of the Trust's Chief Financial Officer, Controller and General Counsel of TAT ("Valuation Committee"), and a Fair Value Committee, composed of all independent trustees of TAT ("Fair Value Committee"), as well as the Board, are responsible for establishing valuation policies, providing direction to TAM regarding the principles of valuing securities, and reviewing securities valuations as determined by TAM.

TAM, Members of the Board, the Valuation Committee, and the Fair Value Committee, appear to have breached their duties to the Fund and TAT by failing to value illiquid securities according to their fair value.

***Second***, I am concerned that the Fund invested far more than 15% of its net assets in illiquid securities, breaching its limits on such investments. The Fund's February 27, 2015 Statement of Additional Information indicated that the Fund adhered to a specific limit on its holding of illiquid securities. It states:

Under normal circumstances, **none of the Funds will purchase or otherwise acquire any investment if, as a result, more than 15% of its net assets (taken at current market value) would be invested in securities that are illiquid**. Generally speaking, an illiquid security is any asset or investment of which a Fund cannot sell a normal trading unit in the ordinary course of business within seven days at approximately the value at which a Fund has valued the asset or investment, including securities that cannot be sold publicly due to legal or contractual restrictions.

March 11, 2016
Page 5

The Statement of Additional Information also provides that the Board will monitor the liquidity of the Fund's investments. The Fund's semi-annual shareholder report also indicates that the Valuation Committee is responsible for "liquidity determinations."

The Fund's policy that it would not purchase or acquire securities that would result in it investing more than 15% of its net assets in illiquid securities aligns with SEC guidance for mutual funds. SEC guidelines generally limit an open-end fund's aggregate holdings of illiquid securities to 15% of a fund's net assets. Investment Company Act Rel. No. 18612 (Mar. 12, 1992) [57 FR 9828] (Mar. 20, 1992). Under the SEC's guidelines, an asset is considered illiquid if it cannot be sold or disposed of in the ordinary course of business within seven days at approximately the value at which the fund has valued the investment on its books. *Id.* (citing Investment Company Act Rel. No. 14983 (Mar. 12, 1986) [51 FR 9773] (Mar. 21, 1986)). In adopting its 15% guideline, the SEC explained as follows:

> To compute an accurate net asset value per share, a mutual fund must be able to value each portfolio security accurately. Mutual funds must use market price to value securities for which market quotations are readily available; the board of directors must make a good faith determination of the fair value of securities for which market prices are not readily available. If the net asset value of a mutual fund is not accurate, purchasing or redeeming shareholders may pay or receive too little or too much for their shares, and the interests of remaining shareholders may be overvalued or diluted.

> To meet these requirements, a mutual fund must maintain a high degree of portfolio liquidity.... The Commission believes that a 15% standard should satisfactorily assure that mutual funds will be able to make timely payment for redeemed shares. Experience has shown that mutual funds generally have not had difficulty in meeting redemption requests from available cash reserves, even during times of abnormally high selling activities in the securities markets. Even if a fund were forced to sell securities to meet redemption requests, substantially all of its remaining assets would be required to be liquid securities which it could sell consistent with appropriate portfolio management.

*Id.* The SEC also made clear that its adoption of the 15% guideline did not "relieve a fund from the requirements concerning valuation and the general responsibility to maintain a level of portfolio liquidity that is appropriate under the circumstances." *Id.* According to the SEC:

> If no market quotations for an illiquid security are available, the board of directors of the fund will be required to determine the fair value of the security. In addition, the Commission expects funds to monitor portfolio liquidity on an ongoing basis to determine whether, in light of current circumstances, an adequate level of liquidity is being maintained. For example, an equity fund that begins to experience a net outflow of assets because investors increasingly shift their money from equity to income funds should consider reducing its holdings of illiquid securities in an orderly fashion in order to maintain adequate liquidity.

March 11, 2016
Page 6

The Fund regularly purported to report the percentage of the Fund's "illiquid" assets in its semi-annual and annual shareholder reports. The Fund repeatedly represented that the Fund complied with the 15% limit, indicating that illiquid securities accounted for 14.25% of the Fund's net assets of October 31, 2014, 12.22% as of April 30, 2015 and 13.40% as of October 31, 2015. October 31, 2014 Annual Shareholder Report at 77; April 30, 2015 Semi-Annual Shareholder Report at 59; October 31, 2015 Annual Shareholder Report at 79.

The Fund's Annual Report to Shareholders also included a Report of Independent Public Accounting Firm, in which PricewaterhouseCoopers LLP certified that the Fund's "statements of assets and liabilities," and "changes in net assets and the financial highlights present fairly, in all material respects, the financial position of the…Third Avenue Focused Credit Fund."

Recent events indicate strongly that the Fund did not limit investment in illiquid securities to 15%. At the time the Fund suspended redemptions, investor redemptions had totaled nowhere near 85% of the fund's net asset value. Had the fund invested no more than 15% of its assets in illiquid securities, it should have been easily able to satisfy the volume of redemption requests it received leading up to the suspension of redemptions and closure of the Fund. The fact that the Fund had to halt redemptions demonstrates that its illiquid investments substantially exceeded the 15% limit.

*Third*, I am concerned that TAT's Board, its Senior Officers and TAM failed to actively and continually monitor the liquidity of the Fund's assets and the Fund's compliance with the 15% limit on investments in illiquid securities. Recognizing this guidance from the SEC, the Fund stated in its Statements of Additional Information that TAT's Board would continually monitor the liquidity of the Fund's assets and the Fund's compliance with its representation of a 15% limit on illiquid securities:

> Over the past several years, strong institutional markets have developed for various types of restricted securities, including repurchase agreements, some types of commercial paper, and some corporate bonds and notes (commonly known as "Rule 144A Securities"). Securities freely salable among qualified institutional investors under special rules adopted by the SEC, or otherwise determined to be liquid, may be treated as liquid if they satisfy liquidity standards established by the Board of Trustees (the "Board"). **The continued liquidity of such securities may not be as well assured as that of publicly traded securities, and accordingly, the Board will monitor their liquidity. The Board will review pertinent factors such as trading activity, reliability of price information and trading patterns of comparable securities in determining whether to treat any such security as liquid for purposes of the foregoing 15% test**. To the extent the Board treats such securities as liquid, temporary impairments to trading patterns of such securities may adversely affect a Fund's liquidity.

*See, e.g.*, March 1, 2015 Statement of Additional Information at 12-13 (emphasis added).

Had TAT's Board, its Senior Officers, and TAM monitored the liquidity of the Fund's assets, the Fund would have maintained sufficient liquid assets to satisfy investor redemptions. The closure of the Fund, the suspension of redemptions, and the dramatic drop in 2015 and 2016

March 11, 2016
Page 7

in the Fund's net asset value strongly suggest that the Fund failed to actively and continually monitor the liquidity of the Fund's assets.

These issues came to a head on December 9, 2015, when TAM shocked the investment community by notifying investors such as myself that the Board had adopted a plan to liquidate the Fund, and that the Fund would no longer accept redemptions or subscriptions. TAM stated: "Investor requests for redemption…in addition to the general reduction of liquidity in the fixed income markets, have made it impracticable for [the Fund] going forward to create sufficient cash to pay anticipated redemptions without resorting to sales at prices that would unfairly disadvantage the remaining shareholders."

The Fund's inability to honor redemptions, and the decision to liquidate the Fund, could not have been a surprise to it, given the increased volatility and illiquidity of the high yield bond market from 2013 through 2015, and increasing redemptions in high-yield mutual funds during the same period. As a result, from at least 2013 through December 9, 2015, it seems highly unlikely that the Fund's illiquid investments were valued according to "fair value," that the Fund limited its illiquid investments to 15%, or that its directors and officers were properly monitoring the liquidity of the Fund's assets.

Accordingly, I wish to examine the books and records described below in order to:

a.      investigate what appears to be willful and grossly negligent breach of fiduciary duty and breach of contractual duties;

b.      pursue, if I deem it appropriate, a shareholder derivative action on behalf of the Fund; and

c.      communicate with other Fund shareholders.

Specifically, I demand the right to inspect and copy the following documents[1]:

1.      All agendas, minutes, and any board packages or materials distributed to any or all members of the Board in advance of, at, or after a meeting of the Board that concern to the Fund's net asset value, the fair value of the Fund's assets or whether securities held by the Fund are liquid or illiquid, including any drafts or final versions of all such documents.

2.      All agendas, minutes, and any packages or materials distributed to any or all members of TAT's Valuation Committee, in advance of, at, or after a meeting of the Valuation Committee, including but not limited to any drafts or final versions of all such documents.

---

[1] The term "documents" includes electronically stored information, including emails.  Unless otherwise specified in a request, the time period for which documents are sought is January 1, 2013 to the present.

March 11, 2016
Page 8

3. All agendas, minutes, and any packages or materials distributed to any or all members of TAT's Fair Value Committee, in advance of, at, or after a meeting of the Fair Value Committee, including but not limited to any drafts or final versions of all such documents.

4. All reports or other documents relating to the methodology of the Board, the Valuation Committee or the Fair Value Committee to determine the Fund's net asset value or the fair value of the Fund's assets.

5. All reports or other documents relating to the decisions by the Board, the Valuation Committee or the Fair Value Committee determining the Fund's net asset value or the fair value of the Fund's assets.

6. All reports or other documents relating to the methodology of the Board, the Valuation Committee or the Fair Value Committee to determine whether any security held by the Fund is liquid or illiquid.

7. All reports or other documents relating to the decisions by the Board, the Valuation Committee or the Fair Value Committee determining whether Fund assets are liquid or illiquid.

8. All reports or other documents tracking whether, at any given time, more than 15% of the Fund's net assets (taken at then-current market value) were invested in securities that were illiquid.

9. All communications with PricewaterhouseCoopers LLP relating to the Fund's net asset value, the fair value of the Fund's assets or whether Fund assets are liquid or illiquid.

10. All communications with any third party retained by TAT, the Board, the Valuation Committee, or the Fair Value Committee in connection with any calculation of the Fund's net asset value or the fair value of the Fund's assets, or any determination of whether any Fund asset is liquid or illiquid.

11. All documents relating to the statements in the Fund's Semi-Annual and Annual Shareholders Reports concerning the percentage of the Fund's assets invested in liquid or illiquid securities.

12. All documents relating to the decision to suspend redemptions in, close and liquidate the Fund in December 2015.

13. All documents relating to the Fund's efforts to liquidate the Fund's assets after the closure of the Fund in December 2015.

14. Documents identifying the members of the Board, the Valuation Committee and the Fair Value Committee at all times throughout TAT's existence.

March 11, 2016
Page 9

15.     Documents identifying by name and position TAT and TAM's ten most highly compensated officers ("Senior Officers") at all times throughout TAT's and TAM's existence.

16.     Communications to which any member of TAT's Board or any Senior Officer was a party that mention the Fund's net asset value, the fair value of the Fund's assets or whether securities held by the Fund are liquid or illiquid.

I hereby designate attorney Edward F. Haber, of the law firm Shapiro Haber & Urmy LLP, 2 Seaport Lane, Boston, MA 02210, telephone number 617-439-3939, email: ehaber@shulaw.com, as my agent for the inspection and copying requested herein. If TAT contends that this demand is incomplete or is otherwise deficient for any reason, please immediately notify my attorney in writing, setting forth the facts that TAT contends support its position and specifying any additional information believed to be required. In the absence of such prompt notice, I will assume that TAT agrees that this demand complies in all respects with the requirements of the DSTA and that TAT will immediately produce all of the requested books and records. I reserve my right to withdraw or modify this demand.

Please advise my attorney as promptly as practicable where and when the items demanded above will be made available. If TAT has not responded within five business days of the date of this demand, I will assume TAT does not intend to comply and will proceed accordingly.

Very truly yours,

Livio Broccolino

Enclosures

# BAY POINT
WEALTH MANAGEMENT

**YOUR INDEPENDENT ADVISOR**

BAY POINT WEALTH MGMT
582 BELLERIVE RD
STE 4D
ANNAPOLIS MD 21409-

For questions regarding the services provided
by your Independent Advisor call
(410) 626-6186

Questions? – Contact us.
(800) 431-3500

*TD Ameritrade Clearing, Inc. Member SIPC*

## MONTHLY STATEMENT

Reporting Period: January 1-31, 2016

### ACCOUNT SUMMARY

**Total Account Value:**

Account:
LINO T BROCCOLINO &
DIANE C BROCCOLINO JT TEN

JOINT TENANTS WROS

### CHANGE IN ACCOUNT VALUE

| | This Month 1/1/16 - 1/31/16 | Year to Date 1/1/16 - 1/31/16 |
|---|---|---|
| BEGINNING VALUE | | |
| Dividends and Interest | | |
| Market Appreciation/(Depreciation) | | |
| Other Income or Expense | | |
| ENDING VALUE | | |
| CHANGE IN VALUE | | |

**Market Appreciation/ Depreciation**
The change in value of investments due to the market movement of their worth, which is separate from value added by corporate offers (such as its reinvestment of dividends) or actual payment and/or your own additions or withdrawals.

**Other Income or Expense**
Miscellaneous expenses including interest paid to the account as well as TD Ameritrade fees (such as for wire transfer or returned checks) and/or miscellaneous income credited to the account such as a margin interest adjustment, royalties, etc.

### SUMMARY OF HOLDINGS (does not represent an asset allocation)

| | Market Value as of 1/31/16 | Percent of Account |
|---|---|---|
| Cash and Cash Alternatives | | |
| Exchange Traded Funds (ETF's) | | |
| Mutual Funds | | |
| **TOTAL VALUE** | | |

TD Ameritrade Institutional



Account
LINDO R BROCCOLINO &
DIANE C BROCCOLINO JT TEN
JOINT TENANTS WROS

## MONTHLY STATEMENT

Reporting Period January 1 - 31, 2016

## HOLDINGS DETAIL (continued)

### MUTUAL FUNDS

| Investment Description | Symbol/CUSIP | Quantity | Closing Price | Market Value |
|---|---|---|---|---|
| THIRD AVENUE TR FOCUSED CREDIT INSTL | TFCIX | 2,254.162 | 5.25 | 11,834.30 |

**TOTAL MUTUAL FUNDS**

**TOTAL HOLDINGS**
**TOTAL ACCOUNT VALUE**

## TRANSACTIONS DETAIL

| Transaction Date | Settlement Date | Activity Type | Description | Symbol/CUSIP | Quantity | Price $ | Transaction Amount |
|---|---|---|---|---|---|---|---|
| 01/04 | 01/04 | Dividends and Interest | | | | | |
| 01/07 | 01/07 | Other Income or Expense | | | | | |

Questions? Consult your independent Advisor:

**TD Ameritrade**

Page 3 of 6



## MONTHLY STATEMENT

Reporting Period: January 1 – 31, 2016

Account
LIVIO R BROCCOLINO &
DIANE C BROCCOLINO JT TEN
JOINT TENANTS WROS

### TRANSACTIONS DETAIL (continued)

| Transaction Date | Settlement Date | Activity Type | Description | Symbol/CUSIP | Quantity | Price | Transaction Amount |
|---|---|---|---|---|---|---|---|
| 01/11 | 01/11 | Dividends and Interest | | | | | |
| 01/29 | 01/29 | Dividends and Interest | | | | | |
| 01/29 | 01/29 | Dividends and Interest | | | | | |

### TD AMERITRADE CASH INTEREST CREDIT/EXPENSE

| Begin Date | Margin Balance | Credit Balance | Number of Days | Interest Rate | Interest Debited | Interest Credited |
|---|---|---|---|---|---|---|
| 01/04 | $ | | 1 | | | $ |
| 01/11 | | | 1 | | | |
| 01/29 | | | 3 | | | |
| **TOTAL INTEREST INCOME/(EXPENSE)** | | | | | | |

Questions? Consult your Independent Advisor:
BAY POINT WEALTH MGMT (410) 626-5199

**TD Ameritrade** Institutional

Page 4 of 6





# MONTHLY STATEMENT

Reporting Period: January 1 - 31, 2016

**Account**
LINO R BROCCOLINO &
DIANE C BROCCOLINO JT TEN

JOINT TENANTS WROS

## INSURED DEPOSIT ACCOUNT ACTIVITY

| Transaction Date | Settlement Date | Transaction | Description | Amount | Balance |
|---|---|---|---|---|---|
| Opening Balance | | | | | |
| 01/05 | 01/05 | Received | | | |
| 01/08 | 01/08 | Delivered | | | |
| 01/12 | 01/12 | Received | | | |
| 01/29 | 01/29 | Received | | | |

**Closing Balance**
TD Bank N.A.

FDIC Insured Deposit Account (IDA) balances reflected in your brokerage account are FDIC-insured up to applicable limits and held by TD Bank, N.A., or TD Bank USA, N.A., or both. The IDA balances are not reviewed by the Securities Investor Protection Corporation (SIPC) protection applicable to your brokerage account.

**** THANK YOU FOR CHOOSING TD AMERITRADE INSTITUTIONAL – END OF STATEMENT ****

**Questions? Consult your Independent Advisor:**
BAY POINT WEALTH MGMT (410) 626-9198

**TD Ameritrade**
Institutional

# BAY POINT
WEALTH MANAGEMENT

**YOUR INDEPENDENT ADVISOR**

BAY POINT WEALTH MGMT
502 BELLERIVE RD
STE 4D
ANNAPOLIS MD 21409-

For questions regarding the services provided
by your independent Advisor call
(410) 626-3108

Questions? - Contact us.
(800) 431-3500

TD Ameritrade Clearing, Inc., Member SIPC

---

## MONTHLY STATEMENT

Reporting Period: January 1 - 31, 2016

Account:
LIVIO R BROCCOLINO ROLLOVER IRA
TD AMERITRADE CLEARING, CUSTODIAN
ROLLOVER IRA

**Total Account Value:**

## ACCOUNT SUMMARY

### CHANGE IN ACCOUNT VALUE

| | This Month 1/1/16 - 1/31/16 | Year to Date 1/1/16 - 1/31/16 |
|---|---|---|
| BEGINNING VALUE | | |
| Dividends and Interest | | |
| Market Appreciation/(Depreciation) | | |
| Other Income or Expense | | |
| ENDING VALUE | | |
| CHANGE IN VALUE | | |

### SUMMARY OF HOLDINGS (does not represent an asset allocation)

| | Market Value as of 1/31/16 | Percent of Account |
|---|---|---|
| Cash and Cash Alternatives | | |
| Exchange Traded Funds (ETFs) | | |
| Mutual Funds | | |
| TOTAL VALUE | | |

**Market Appreciation/Depreciation**
The change in value of investments due to the market movement also to the corporate actions (such as the issuance of any your own corporate or stock splits or withdrawals.

**Other Income or Expense**
Miscellaneous expenses including management fees, as well as TD Ameritrade fees (such as a wire transfer or related charge) and/or miscellaneous income credited to the account such as a margin interest adjustment, migration, etc.

**TD Ameritrade**
Institutional



# MONTHLY STATEMENT

Reporting Period: January 1 - 31, 2016

**Account**
LINO R BROCCOLINO ROLLOVER IRA
TD AMERITRADE CLEARING, CUSTODIAN

ROLLOVER IRA

## HOLDINGS DETAIL

### CASH AND CASH ALTERNATIVES

| Investment Description | Quantity | Price | Market Value |
|---|---|---|---|
| FDIC INSURED DEPOSIT ACCOUNT IDA12 NOT COVERED BY SIPC | | $ | |
| **TOTAL CASH & CASH ALTERNATIVES** | | | |

### EXCHANGE TRADED FUNDS (ETFs)

| Investment Description | Symbol/ CUSIP | Quantity | Closing Price | Market Value |
|---|---|---|---|---|
| | | | | |

**TOTAL EXCHANGE TRADED FUNDS (ETFs)**   TOTAL EXCHANGE TRADED FUNDS - LONG POSITION

**Questions? Consult your Independent Advisor:**
BAY POINT WEALTH MGMT (410) 625-8198

**TD Ameritrade** Institutional

Page 2 of 8



# MONTHLY STATEMENT

Reporting Period: January 1 - 31, 2016

**Account**
LINDA R BROCCOLINO ROLLOVER IRA
TD AMERITRADE CLEARING, CUSTODIAN

ROLLOVER IRA

## HOLDINGS DETAIL *(continued)*

**MUTUAL FUNDS**

| Investment Description | Symbol/CUSIP | Quantity | Closing Price | Market Value |
|---|---|---|---|---|
| THIRD AVENUE TR FOCUSED CREDIT INSTL | TFCIX | 6,563.094 | 5.25 | 34,456.24 |
| **TOTAL MUTUAL FUNDS** | | | | |
| **TOTAL HOLDINGS** | | | | $535,516.69 |
| **TOTAL ACCOUNT VALUE** | | | | $535,516.69 |

Questions? Consult your independent Advisor:
BAY POINT WEALTH MGMT (410) 626-8193

TD Ameritrade
Institutional

Page 3 of 6



# MONTHLY STATEMENT

Reporting Period: January 1 - 31, 2016

Account 922-988491
LIVIO R BROCCOLINO ROLLOVER IRA
TD AMERITRADE CLEARING, CUSTODIAN

ROLLOVER IRA

## TRANSACTIONS DETAIL

| Transaction Date | Settlement Date | Activity Type | Description | Symbol/ CUSIP | Quantity | Price | Transaction Amount |
|---|---|---|---|---|---|---|---|
| 01/04 | 01/04 | Dividends and Interest | | | | $- | |
| 01/04 | 01/04 | Buy | | | | | |
| 01/07 | 01/07 | Other Income or Expense | | | | | |
| 01/11 | 01/11 | Dividends and Interest | | | | | |
| 01/11 | 01/11 | Buy | | | | | |
| 01/19 | 01/19 | Dividends and Interest | | | | | |
| 01/19 | 01/19 | Buy | | | | | |
| 01/29 | 01/29 | Dividends and Interest | | | | | |

Questions? Consult your Independent Advisor:
BAY POINT WEALTH MGMT (410) 626-8196

TD Ameritrade Institutional

Page 4 of 8

# MONTHLY STATEMENT

Reporting Period: January 1 - 31, 2016

Account
LIVROR BROCCOLI AND ROLLOVER IRA
TD AMERITRADE CLEARING, CUSTODIAN

ROLLOVER IRA

## TRANSACTIONS DETAIL (continued)

| Transaction Date | Settlement Date | Activity Type | Description | Symbol/ CUSIP | Quantity | Price | Transaction Amount |
|---|---|---|---|---|---|---|---|
| 01/29 | 01/29 | Buy | | | | | |
| 01/29 | | Dividends and Interest | | | | - | |

## TD AMERITRADE CASH INTEREST CREDIT/EXPENSE

| Begin Date | Margin Balance | Credit Balance | Number of Days | Interest Rate | Interest Debited | Interest Credited |
|---|---|---|---|---|---|---|
| 01/19 | $ | | 1 | 0.0100 | - | $ |

**TOTAL INTEREST INCOME/(EXPENSE)**



Questions? Consult your Independent Advisor:
BAY POINT WEALTH MGMT (410) 626-8198

TD Ameritrade Institutional



# MONTHLY STATEMENT

Reporting Period: January 1 – 31, 2016

**Account**
LIVIO R SBOCCOLINO ROLLOVER IRA
TD AMERITRADE CLEARING, CUSTODIAN
ROLLOVER IRA

## INSURED DEPOSIT ACCOUNT ACTIVITY (continued)

| Transaction Date | Settlement Date | Transaction | Description | Amount | Balance |
|---|---|---|---|---|---|
| 01/29 | 01/29 | Received | | | |

**Closing Balance**
TD Bank NA
TD Bank USA NA

FDIC Insured Deposit Account (IDA) balances reflected in your brokerage account are FDIC-insured up to applicable limits and held by TD Bank, N.A., or TD Bank USA, N.A., or both. The IDA balances are not covered by the Securities Investor Protection Corporation (SIPC) protection applicable to your brokerage account.

**** THANK YOU FOR CHOOSING TD AMERITRADE INSTITUTIONAL - END OF STATEMENT ****

Questions? Consult your Independent Advisor:
BAY POINT WEALTH MGMT (410) 625-8169



**TD Ameritrade** Institutional



THIS PAGE IS INTENTIONALLY LEFT BLANK

**Exhibit B**

# KRAMER LEVIN NAFTALIS & FRANKEL LLP

JONATHAN M. WAGNER
PARTNER
PHONE 212-715-9393
FAX 212-715-8393
JWAGNER@KRAMERLEVIN.COM

March 23, 2016

BY PDF
Edward F. Haber
Shapiro Haber & Urmy LLP
2 Seaport Lane
Boston, MA 02210

Re:  Third Avenue Trust

Dear Mr. Haber:

I have been retained in connection with your demand for inspection of books and records of Third Avenue Trust and, accordingly, I am responding to your March 11, 2016 letter.

Section 3819 of the Delaware Statutory Trust Act provides that any right of inspection is subject to "reasonable standards (including standards governing what information and documents are to be furnished at what time and location and at whose expense) . . . ."  In addition, Section 3819 provides that the Trustees may keep confidential "any information that such persons reasonably believe to be in the nature of trade secrets or other information the disclosure of which such persons in good faith believe is not in the best interest of the statutory trust or could damage the statutory trust or its business. . . ."  Finally, Section 3819 limits disclosure to "Information regarding the business and financial condition of the statutory trust" and "Other information regarding the affairs of the statutory trust as is just and reasonable."

Thus, before the Trust may produce any material, we need to discuss the parameters of the production, confidentiality issues, and who bears the expense of production.

Would you please let me know when you are available to discuss these important issues.

Yours truly,

Jonathan M. Wagner

JMW:jgf
cc:  Sean Coffey, Esq.

KL3 3070732.1

# SHAPIRO HABER & URMY LLP

### Attorneys at Law

Thomas G. Shapiro
Edward F. Haber
Thomas V. Urmy, Jr.                                          Edward F. Haber
Michelle H. Blauner                                          ehaber@shulaw.com
Ian J. McLoughlin

Adam M. Stewart                                    March 25, 2016
Patrick J. Vallely
Caroline B. Curley

**By Email (PDF)**

Jonathan M. Wagner
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036-2714

Re:     Section 3819 Demand to Third Avenue Trust

Dear Mr. Wagner:

I write to respond to your letter of March 23, 2016 concerning the demand for inspection of books and records that my client, Livio Broccolino, made to Third Avenue Trust by letter dated March 14, 2016. You raised three issues in your letter: the "parameters of production," "confidentiality issues," and the "expense of production."

First, with respect to the "parameters of production," please identify the Trust's position on the proper "parameters of production" for the Trust's response to Mr. Broccolino's demand.

Second, with respect to any confidentiality issues, we are willing to enter a customary confidentiality agreement in connection with the Trust's anticipated response to the demand. Please send to me a proposed draft agreement.

Third, please let us know the "expense[s] of production" the Trust contends Mr. Broccolino should bear.

Upon receipt of the Trust's positions on each of these issues, we can attempt to resolve any disagreements. Thank you for your attention to this matter.

Sincerely,

Edward F. Haber

Seaport East, Two Seaport Lane, Boston, Massachusetts 02210   (617) 439-3939   Fax (617) 439-0134

**Patrick Vallely**

---

| | |
|---|---|
| **From:** | Wagner, Jonathan M. [jwagner@KRAMERLEVIN.com] |
| **Sent:** | Friday, March 25, 2016 5:26 PM |
| **To:** | Patrick Vallely |
| **Cc:** | Ed Haber |
| **Subject:** | RE: Third Avenue Trust |

I will send you a draft confidentiality agreement early next week.  Then we can discuss the rest.

**Jonathan M. Wagner**
Partner

**KRAMER LEVIN**
**NAFTALIS & FRANKEL** LLP
1177 Avenue of the Americas
New York, New York 10036
O: 212-715-9393 | F: 212-715-8393 | M: 917-951-8228
jwagner@kramerlevin.com
view bio
www.kramerlevin.com

This communication (including any attachments) is intended solely for the recipient(s) named above and may contain information that is confidential, privileged or legally protected. Any unauthorized use or dissemination of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by return e-mail message and delete all copies of the original communication. Thank you for your cooperation.

**From:** Patrick Vallely [mailto:PVallely@shulaw.com]
**Sent:** Friday, March 25, 2016 5:23 PM
**To:** Wagner, Jonathan M.
**Cc:** Ed Haber
**Subject:** Third Avenue Trust

Jonathan –

Attached please find a letter.

Patrick J. Vallely
**SHAPIRO HABER & URMY LLP**
**Seaport East**
**Two Seaport Lane**
**Boston, MA  02210**
Tel: 617-439-3939, ext. 321 | Fax: 617-439-0134
pvallely@shulaw.com
www.shulaw.com